UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------X
UNITED STATES OF AMERICA

|                    | **MEMORANDUM & ORDER** |
| :----------------- | :--------------------- |
| -against-          | 21-CR-71(DRH)          |

NICHOLAS PASCULLO.
------------------------------------------------------X

**APPEARANCES:**

**For the Government:**
U.S. Department of Justice
Tax Division
Northern Criminal Enforcement Section
P.O. Box 972
Washington, D.C. 20044
By: Eric B. Powers, Esq.

**For Defendant:**
Naiburg, Obedin & Weissma, LLP
The Courthouse Corporate Center, Suite 4200
Central Islip, New York 11722
By: Glenn Obedin, Esq.

**HURLEY, Senior District Judge:**

The purpose of this Memorandum is to address defendant's motion for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A)(i).  For the reasons set forth below, the motion is denied.

Background

On February 19, 2021, defendant pled guilty before the Honorable Steven L. Tiscione, U.S. Magistrate Judge, to a single count information, which charged that between January 1, 2012 and April 15, 2017, defendant, together with others, attempted

to evade and defeat income and employment taxes due and owing by him and H20 Car

Wash & Exotic Detailing, LLC, to the United States of America for calendar years 2012

through 2016, through various methods, causing a tax loss of approximately $247,469.90

in income taxes and approximately $67,531.79 in FICA taxes, in violation of 26 U.S.C. §

7201.

As detailed in the PSR and accurately recounted by the government, the

underlying conduct was as follows:

> [F]rom approximately 2009 to May 2017, Pascullo was the co-owner and
> operator of H2O Car Wash & Exotic Detailing, LLC ("H2O"), a car wash
> company located in Lindenhurst, New York. (PSR ¶ 3-4). From at least 2012
> through 2016, Pascullo operated H2O primarily as a cash business and
> underreported cash receipts on the company's annual partnership tax
> returns. (*Id*.) Because Pascullo underreported H2O's profits to its tax
> preparer – or, for some years, did not report any information at all – Pascullo
> drastically reduced his own tax liability and that of his partners in H2O. (*Id*.
> at ¶ 4). He also gained an unfair advantage over other local businesses by
> choosing not to pay his share of employment taxes based on under-the-table
> cash payments he made to his employees in at least 2012 and 2013. (*See id*. ¶
> 8). Pascullo also convinced the eventual buyer of H2O car wash into thinking
> he was getting a much more profitable business than it actually was.
>
> In December 2014, the Internal Revenue Service-Criminal Investigation
> ("IRS-CI") executed a search warrant at H2O and seized physical and
> electronic evidence demonstrating Pascullo operated H2O as a cash business
> and did not pay his fair share of taxes. (*Id*. ¶ 6). Among other evidence, IRS-
> CI agents seized records from H2O's car wash management system,
> Innovative Control Systems, Inc. ("ICS"). ICS enabled H2O to operate the
> mechanical car wash and track all financial transactions, including sales,
> services, promotions, discounts, and other items. (*Id*.) The investigation
> revealed that Pascullo had discovered how to manipulate the ICS data,
> reducing or increasing the company's earnings to suit his desires. (*Id*.)
> Indeed, this evidence established that Pascullo maintained not just a double
> set of books but a triple set of books: (1) an accurate version of H2O's books
> and records stored within the ICS carwash software, (2) a deflated version
> that minimized the company's profits, which he provided to H2O's tax
> preparer to reduce his tax liability, and (3) an inflated version he provided to

potential purchasers of the business to overstate the business's profitability. (*Id*. ¶ 7).

In May 2017, Pascullo sold H2O to a third party. (*Id*.). Because the company's books and records were still available within the ICS software, the government was able to determine the total amount of unreported income H2O should have reported if the company had accurately filed Forms 1065 for tax years 2012 through 2016, and likewise the personal benefit Pascullo realized on his personal tax returns as a result. (*Id*.) Based on the IRS's calculations, from 2012 to 2016, Pascullo underreported H2O's income by more than $1.3 million. (*Id*. ¶ 8). As a result, Pascullo owed a tax loss of $247,469.90 on his individual income tax returns. (*Id*.) In addition, Pascullo underreported the 2012 and 2013 wages paid by H2O to its employees by nearly $500,000. (*Id*.) As a result, H2O also owed more than $66,000 in employment taxes. (*Id*.) The total tax loss attributable to Pascullo's conduct was conservatively estimated at $315,001.69.

Gov't's Opp. (DE 20) at 1-2).

Sentencing took place on September 30, 2021. With an offense level of 15 and no criminal history points, defendant's guideline range was 18-24 months.  The Court sentenced  him to six months incarceration followed by two years supervised release. Defendant is scheduled to surrender to the BOP on May 16, 2022.

<u>The Present Application</u>

Defendant acknowledges that he has not exhausted his administrative remedies but argues impossibility as he has not been designated to a particular institution and that being in custody is not a requirement for the current application.  He maintains that extraordinary and compelling reasons for a reduction exist as his prosthetic leg puts him at risk of serious complications and unwarranted vulnerability to other inmates. He further argues that the sentencing factors support the application as he is a low-risk, non-violent offender who is suited for home detention and apart from a 25-year-old

drinking and driving conviction has a spotless record and has a history of familial and community service together with demonstrated work ethic.

The government opposes the application arguing that he has not exhausted his administrative remedies, has not demonstrated extraordinary and compelling reasons for the reduction, and the sentencing factors do not support the application.

Discussion

As amended by the First Step Act, 18 U.S.C. § 3582(c)(1)(A), provides:

The court may not modify a term of imprisonment once it has been imposed except that - -
  (1) in any case - -

(A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in 3553(a) to the extent that they are applicable, if it finds that - -

(i) extraordinary and compelling reasons warrant such a reduction; or

(ii) the defendant is at least 70 years of age, has served at least 30 years in prison pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community under section 3142(g);

and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission;

There are three requirements that must be satisfied before a Court can grant a motion for compassionate relief. First, absent waiver or forfeiture by the government, an inmate must exhaust administrative remedies by requesting such relief from prison authorities. *See United States v. Saladino*, 7 F.4th 120, 123 (2d Cir 2021) (holding that §3582(c)(1)(A)'s exhaustion requirement is a "claim-processing rule," and not a jurisdictional requirement and thus "may be waived or forfeited by the government."). Second, a defendant must demonstrate extraordinary and compelling circumstances. In *United States v. Brooker*, 976 F.3d 228, 237 (2d Cir. 2020), the Second Circuit held that while courts may look to the applicable policy statements issued by the Sentencing Commission, they are free to consider "the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them in motions for compassionate release." Third, a court must "consider[ ] the factors set forth in [18 U.S.C. §] 3553(a) to the extent that they are applicable" 18 U.S.C. § 3582(c)(1)(A); *see United States v. Jones*, 17 F.4th 371, 374-75 (2d Cir. 2021) and find they support the application.

Turning first to exhaustion, the government has raised the lack of exhaustion and thus it has not been waived.  Given the government's objection, it would appear that the lack of exhaustion is a basis to deny defendant's application.  However, the arguments as to exhaustion need not be addressed because even if the lack of exhaustion does not warrant denial of defendant's motion, the application fails on the merits.

Uncontroverted by defendant[1] is the government's position that "[t]he BOP daily cares for inmates facing a variety of health issues, and it will be able to capably care for the defendant's medical needs during his six-month period of incarceration." (Gov't's Opp. (DE 20) at 5.) Given that ability, extraordinary and compelling reason for release do not exist. Moreover, defendant's health condition was explicitly considered by this Court in rejecting the probation department's recommendation of probation and imposing a period of incarceration. (*See* Sept. 30, 2021 Sentencing TR. at 20-21.)

In sentencing defendant to a period of incarceration, the Court considered all the 3553(a) factors. In addition to the nature and circumstances of the crime (*id*. at 16), weighing most heavily in the Court's view was the need for general deterrence. As stated by the Court:

> [T]he transgressions of which the defendant stands convicted based on his acknowledgment of guilt show by their very nature a disrespect of the law. The only way you can accomplish this goal was basically to ignore the law or to pervert it to the extent that you didn't pay your fair share of income tax as well as payroll taxes.
> . . .
> But what I think is very important here is general deterrence. As . . . I have indicated, we fund the government in significant measure via income taxes and other taxes that are leveed on individuals and entities. People should understand that if they do violate the law by not meeting their income tax obligations and other tax obligations, and if in the unlikely event they're ever apprehended, and if apprehended, they're convicted, that dire consequences may follow.

---

[1] Although provided an opportunity to file a reply to the government, defendant did not do so.

*Id.* at 22.

The same considerations warrant denial of the current application.  Indeed, to grant it would undermine the aims of the Court's original sentence. *See United States v. Roney*, 833 F. App'x 850, 853-54 (2d Cir. 2020) (stating a court may consider how a reduction in sentence would undermine the aims of the original sentence).

Having considered all of defendant's arguments, the motion for compassionate release is denied.

**SO ORDERED.**

Dated: Central Islip, New York
   April 27, 2022

      s/ Denis R. Hurley
     Denis R. Hurley
     United States District Judge